```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                      CASE NO. 20-MC-24198-JEM
 3
      IN RE APPLICATION OF
 4    MULTIFLORA INTERNATIONAL
      LTD, et al.,
 5                                          Miami, Florida
                      Plaintiff(s),
 6                                          April 23, 2021
               vs.
 7
      JACOBI INTERNATIONAL, INC.,
 8
                      Defendant(s).      Pages 1 - 50
 9    ---------------------------------------------------------

10                        MOTION HEARING
              TRANSCRIBED FROM DIGITAL AUDIO RECORDING
11            BEFORE THE HONORABLE JACQUELINE BECERRA
                  UNITED STATES MAGISTRATE JUDGE
12
      APPEARANCES:
13
      FOR THE PLAINTIFF(S):   RAFAEL R. RIBEIRO, ESQ.
14                            HOGAN LOVELLS
                              600 Brickell Avenue
15                            Miami, FL 33131
                              305-459-6500
16                            rafael.ribeiro@hoganlovells.com

17
      FOR THE DEFENDANT(S):   JEFFREY D. MARCUS, ESQ.
18                            JASON MAYS, ESQ.
                              MARCUS NEIMAN & RASHBAUM, LLP
19                            2 South Biscayne Boulevard
                              Miami, FL 33131
20                            305-400-4260
                              jmarcus@mnrlawfirm.com
21                            jmays@mnrlawfirm.com

22
      TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
23                            Court Reporter
                              jemancari@gmail.com
24

25
```

1    Thereupon,

2    the following proceedings were held via telephone:

3             THE DEPUTY CLERK:  Case No. 20 24198, MC, Martinez.

4    In Re Application of Multiflora International, Ltd*., et al.*

5             Counsel, please state your appearances for the record.

6             MR. RIBEIRO:  Good morning, your Honor.  Rafael

7    Ribeiro, with Hogan Lovells, for the applicants.

8             MR. MARCUS:  Good morning, your Honor.  Jeff Marcus

9    and Jason Mays on behalf of the respondents, from Marcus Neiman

10   Rashbau & Pineiro.

11            THE COURT:  All right.  Anybody else making

12   appearances?

13            MR. MARCUS:  I don't believe so, your Honor.

14            THE COURT:  All right.  So I set this today for

15   argument on Multiflora's application.

16            I have looked at the application.  I have looked at

17   the response to the application.  There was a reply and a

18   surreply.  Just like every judge loves to have, there were two

19   statuses -- one filed late last night and one filed early this

20   morning, and I have looked at both of those and, even though

21   they were pretty last minute, I appreciate the update provided

22   in both.

23            I have read everything.  I am very familiar with the

24   1782 standards.  I am going to tell you first what my concerns

25   are and where I am going with this and then, Mr. Ribeiro, I

1   will ask you to respond to my concerns in your argument.

2          You can argue anything you want.  You can make other

3   arguments if you need to.  Just be mindful as best you can of

4   addressing what my concerns are.

5          I would ask, Mr. Marcus, if you do the same.

6          There are a couple of things that are sort of sticking

7   out to me right now.  One is this issue of standing.  So again,

8   I have read the briefs, but I am concerned given the timing of

9   the representative that the standing issue is not sufficiently

10  clear.

11         So the standing issue is one issue I have.

12         The second issue I have is I'd like a little bit more

13  clarity as to what exactly is pending in Guatemala now and what

14  exactly the applicants intend to pursue in Guatemala, because

15  if what is being pursued, for example, are the saleable

16  particular properties that were noted, then we are looking at a

17  much more narrow application.  But I don't have a good sense,

18  and if there is something in the record that would help me get

19  clarity on it, I don't have a great sense of what the

20  proceeding or any contemplated proceeding for that matter in

21  Guatemala is or might be.  So that is one issue I have.

22         Another issue I'd like the parties to address is, at

23  least the respondents, and I apologize for using their first

24  names, but I guess that is how I kept it straight in my head,

25  and that is Christian, at least in the affidavit, in the

1    response, or at least in the surreply -- I forget which one had

2    this affidavit -- he says under oath that if there is a

3    Guatemalan proceeding that these documents that are potentially

4    at issue here are subject to the jurisdiction of the court in

5    Guatemala, which I don't think ends the inquiry.  I think

6    applicants would still be entitled to documentation that could

7    go to one of the Intel factors obviously.

8         But I'd like argument or for you to address why the

9    representation that if and when, if you need these for the

10   Guatemalan proceeding, well, if and when the Guatemalan

11   proceeding really gets under way you will have them because he

12   is not objecting to providing them there.  So that is something

13   else I want touched upon or discussed.

14        Then finally, I do think that, even if we were able to

15   get over all these other issues and we are just looking at what

16   was necessary for the Guatemalan action or what would be

17   appropriate, it seems to me that this discovery is very far

18   reaching.  So I want you to address why the discovery as

19   written, as you sit here today, is something that is

20   appropriate.

21        Then the last thing, and this might be maybe more for

22   you, Mr. Marcus, I'm not sure, but I would like both of you to

23   address it, it seems to me, at least as to the surreply or

24   maybe it was one of the statuses, that I don't think there is

25   much debate about the statutory factors, right.  I think this

 1    really comes down to the Intel factors.

 2          As you plot out your argument, I do want you to

 3    address whether or not there is really any dispute as to the

 4    statutory factors or whether what we are reviewing is more in

 5    line with the Intel factors.  I understand that standing is

 6    neither here nor there to the factors per se, but if you could

 7    also address that issue, I'd appreciate it.

 8          So, Mr. Ribeiro, I don't mean to make you on the fly

 9    here completely reorganize whatever argument you had in mind.

10    I just want to make sure that when you get to that part of your

11    argument, these are the issues I'm thinking about, these are

12    the issues that I really want to focus on.  So, like I said,

13    feel free to make whatever argument you already prepared to

14    make, but if you focus when you get to these issues a little

15    bit more for me and give me a little bit more meat on those, I

16    would really appreciate it.

17          MR. RIBEIRO:  Of course, your Honor.  Thank you.

18          So I'll start with your first question regarding the

19    standing issue.  I think in the surreply respondents

20    essentially concede that the time of the filing of the

21    underlying Guatemala, or, rather, at the time of the filing of

22    the amended application, Mr. Xicara is and still remains today

23    the legal representative of the applicants.

24          So although they contend that they think they are

25    going to be able to remove Mr. Xicara as legal representative,

1   at the time of the filing of the amended application he was

2   legal representative.  So I don't think there is a question at

3   all with regard to standing.

4          THE COURT:  Let me ask you --

5          MR. RIBEIRO:  Sure.

6          THE COURT:  -- and Mr. Marcus will address it when it

7   is his turn, is the argument that, yes, he was the legal

8   representative at the time and even though they take issue with

9   that and intend to do something about it, aren't they arguing

10  that he really isn't?  In other words, yes, you have

11  documentation showing that there was some change, but I think

12  they are disputing sort of fundamentally whether that change is

13  valid, right?  I see it as they have made a challenge to his

14  ability to be the representative.  So maybe that is not what

15  they are doing.  If that is what they're doing, does that

16  affect your standing or not?

17         MR. RIBEIRO:  Respectfully, your Honor, I don't think

18  that determination should be made by this court.

19         THE COURT:  No.  Hold on.  I 100 percent agree I can't

20  make that determination, and I have no intention of making it.

21         I guess my point is, you have brought forward evidence

22  that says the legal representative is this person and here it

23  is.  They have brought evidence that said it is not the legal

24  representative.  I don't think I can find who is or who is not.

25  But is the challenge to the legal representative sufficient to

1   create at least enough doubt as to whether or not these parties

2   properly have standing to bring the action.

3          MR. RIBEIRO:  Your Honor, again, I would say that in

4   their surreply they essentially concede the fact that

5   Mr. Xicara was at the time of the filing of the applications

6   the legal representative.  They say it is a bit of a ping pong,

7   that there were replacements, etc., but at the end of the day

8   in their surreply on page 3, I think the best they can muster

9   is that they hope that he is going to be removed.

10          To me, the standing inquiry ends at he was at the time

11   the legal representative, and they have not proffered any

12   evidence that shows that he wasn't.  So I think that the

13   standing issue is already determined from the applicants'

14   perspective.

15          THE COURT:  Just give me a minute and let me just find

16   the surreply and let me highlight that.

17          MR. RIBEIRO:  Sure.  It is beginning at the top of

18   page 3, your Honor, until about the middle.

19          THE COURT:  The surreply is docket 18.

20          MR. RIBEIRO:  Docket 18, your Honor.

21          They even go further and say:  Respondents maintain

22   that the court need not address the authorization issue at all

23   because the amended application should fail on other grounds.

24          THE COURT:  I'm sorry.  I just got to page 3.  Tell me

25   where I should be looking.

1          MR. RIBEIRO:  Yes, your Honor.  They have described

2     the so-called ping-pong match of this designating legal

3     representatives at the first paragraph.

4          THE COURT:  Yes.

5          MR. RIBEIRO:  But the dispositive one for me would be

6     the second, where they hope that he is removed or will be

7     removed, they assert, but then the respondents themselves say

8     you don't have to reach that inquiry here.

9          (Pause)

10         THE COURT:  All right.  I am not exactly -- we'll see

11    when Mr. Marcus is up to argue.  You might be right that that

12    is the right reading of that.  I read that differently.  I have

13    made my note here.

14         All right.  You can continue.

15         MR. RIBEIRO:  OK.  As far as the standing issue, we

16    think we've covered that, your Honor.

17         The second is that applicants agree with your Honor

18    that the statutory factors have been satisfied.  They didn't

19    dispute the first two factors.  The only factor that they

20    disputed was the existence of the foreign proceedings, and

21    initially they said they were already dismissed.  When they

22    were shown documentary evidence that it hadn't been dismissed,

23    they conceded that point in their surreply.  In their status

24    report of last night respondents concede -- and again, this is

25    undisputed -- the Guatemalan proceedings are very much alive.

1    We agree with the court that the statutory 1782 factors have

2    been satisfied.

3          With respect to the status of the underlying

4    proceedings, your Honor, we submit that it is not as narrow as

5    the court framed initially, that Mr. -- I am going to use his

6    first name just because they're brothers -- that Christian

7    Rasch's malfeasance and evidence of that that we are seeking

8    here will be probative to the Guatemalan court in the overall

9    scheme of the pre-proceedings occurring below and, as

10   respondents introduced last night -- and again, this is

11   undisputed -- these issues will be very much alive with respect

12   to the current proceedings in the BVI, where Mr. Christian

13   Rasch has now obtained an *ex parte* freezing order making a

14   series of allegations, and in their defense the applicant,

15   Multiflora, intends on submitting additional evidence of this

16   malfeasance in response.

17         So I don't know if that satisfies the court's question

18   with regard to the underlying Guatemalan proceedings' status.

19         THE COURT:  No, it doesn't.  So I know that the -- I

20   don't think that I can look at the BVI proceeding, honestly,

21   because nobody has really made argument as to the BVI

22   proceeding.  I know there is something else going on, and I

23   appreciate that.

24         What I'm focusing on in the Guatemalan proceeding is

25   literally what is the Guatemalan proceeding about.  In other

1    words, what was filed in Guatemala or what allegation is being

2    reviewed in Guatemala, what is the scope of the Guatemalan

3    proceeding.

4         MR. RIBEIRO:  Your Honor, the scope is, as we have

5    discussed in our application, these claims against Entre Rios

6    administrators for misappropriation, moral turpitude, fraud and

7    criminal conspiracy, and then again lately, the latest-filed

8    case was an August 20 criminal complaint against Christian for

9    improper use of documents, fraud, moral turpitude and criminal

10   conspiracy.

11        THE COURT:  Right.  But I guess my point what is in

12   the application.  I see it on page 6 and 7.  I understand that

13   some of it is the title.  I want to know what was alleged,

14   right?  Was there an allegation made?  What are the facts

15   alleged?  What is the relief being sought?

16        Because this just tells me there was a criminal

17   complaint filed, right, against the administrators for

18   misappropriation, moral turpitude, fraud and criminal

19   conspiracy.  Is there a time frame for that allegation?  Is

20   there something more sufficient about what was filed?

21        MR. RIBEIRO:  Your Honor, well, respectfully, I think

22   we have alleged sufficiently for purposes of a 1782 application

23   with respect to the existence of these proceedings below, which

24   is a threshold question that's been answered.  Admittedly, I'm

25   not counsel of record, obviously, for the parties in Guatemala.

1    I would have to come back to the court and provide supplemental

2    explanation of exactly what is being alleged below or even

3    provide translations of the pleadings, if that is what the

4    court requires.

5         Again, the analysis under 1782, as your Honor knows,

6    doesn't require the court to get into the underlying merits of

7    what is being asserted in Guatemala.

8         THE COURT:  Right.  I am not interested in what the

9    merits are.  I think that is correct.  I don't have to

10   determine whether the Guatemalan is a strong case, a weak case,

11   a case that is likely to succeed.  I don't think I have to do

12   that.  But if I am going to determine whether or not the

13   documents that you seek, right, have any relationship to the

14   Guatemalan proceedings, I have to understand the Guatemalan

15   proceedings.

16        So saying that there is a Guatemala proceeding for

17   conspiracy and I don't have, for example, the date ranges -- so

18   I'll tell you when I get these, and I do these quite a bit, I

19   do typically see much more detail as to what the complaint in

20   the foreign country is about or what the factual predicate for

21   the complaint is about.

22        So the reason that I was focusing on the properties is

23   because that is what the factual predicate in the application,

24   or at least that is what it alludes to.  I assume there is

25   more, but I guess that is what I was asking you.

1          Is there more you can provide to the court now or is

2     there something you have already filed and maybe I missed that

3     can give --

4          MR. RIBEIRO:  No, your Honor.  We would request an

5     opportunity to supplement the record to get more granular about

6     the underlying proceedings in Guatemala if that is what the

7     court requires.

8          THE COURT:  OK.  All right.

9          MR. RIBEIRO:  So with respect to -- your Honor, then,

10    again, we think that the statutory factors have been satisfied,

11    and then you are talking about now, which we agree with, which

12    is really a weighing of the Intel discretionary factors.

13         If your Honor would like me to go through them at this

14    point or do you have any other questions before I go there?

15         THE COURT:  No.  Sure.  Go ahead.

16         MR. RIBEIRO:  Your Honor, there is no question that

17    the subpoena recipients here are not parties to the Guatemalan

18    proceedings, right, and there is also no dispute that the

19    subpoena recipients are not subject to the Guatemalan court's

20    jurisdiction.

21         The only argument made by respondents is this

22    one-in-the-same argument, that because the entities here, Cart

23    Investments and Jacobi and because Morgan Stanley and Bank of

24    America, Mr. Christian Rasch reportedly has access to these

25    records, really they are one in the same and therefore the

1    court should treat the subpoena recipients as de facto

2    participants in the foreign proceeding.  Your Honor, we think

3    that that reasoning is flawed.

4         First of all, cases are legion where 1782 applications

5    are aimed at financial institutions that have a connection to

6    someone similar to the intervenor here.  So it would completely

7    obliterate the need of 1782 or its reach if the intervenor,

8    such as Mr. Christian Rasch, could say, well, really, I have

9    control of those accounts so really no bother to go and get

10   that information from the financial institution.

11        Secondly, although Mr. Rasch is an officer or director

12   or at least signed the corporate disclosures for the Florida

13   entities, there are other individuals, including his daughters,

14   that are on that file.  So we don't -- on that corporate

15   structure.  So we don't know whether he has information or the

16   totality of the information regarding those entities.

17        Again, we apologize for the early filing this morning,

18   but what the court could already determine from the California

19   1782 application is that Mr. Christian Rasch's daughters are

20   very much involved in these transfer of funds that your Honor

21   has no -- there is no legitimate explanation as to how, for

22   example, Multiflora shares in the entity, controlled by his

23   daughter, are canceled and then transferred to a Panamanian

24   company that is also associated with his daughter.

25        So, your Honor, we don't think they have made a

1    persuasive argument with regard to this one-in-the-same theory,

2    that the court should simply disregard our request to these

3    third-party entities because Mr. Christian Rasch purportedly

4    has control over these documents.

5            THE COURT:  Let me ask you a question.

6            MR. RIBEIRO:  Sure.

7            THE COURT:  Who are the parties in the Guatemalan

8    proceeding?

9            MR. RIBEIRO:  I beg your pardon, your Honor?

10           THE COURT:  Who are the parties in the Guatemalan

11   proceeding?  That is why I'm asking for more information on the

12   Guatemalan proceedings because I don't know who would be the

13   parties that are going to be, well, the parties in the

14   Guatemalan proceeding.

15           MR. RIBEIRO:  I think we covered that on paragraph 19

16   of our application, your Honor.

17           With respect to the June 2020 private criminal

18   complaint, it is applicant Entre Rios and applicant Multiflora

19   against former Entre Rios administrators.

20           The July 2020 private complaint, criminal complaint,

21   by applicant Esperanza Jacobi and Multiflora against

22   Mr. Christian Rasch, his companies, and former Esperanza Jacobi

23   administrators.

24           Finally in the August proceeding, a private criminal

25   complaint by applicant Entre Rios against Mr. Christian Rasch

```
 1   and certain of his entities and former Entre Rios
 2   administrators.
 3           THE COURT:  All right.  So let me stop you there for a
 4   second.  So as to the June 23rd -- there is one that is
 5   dismissed.  Which one is the one that is dismissed?
 6           MR. RIBEIRO:  No, your Honor, we don't adopt that.
 7           THE COURT:  You're right, all of them are in.
 8           MR. RIBEIRO:  All three are in play.
 9           THE COURT:  OK.  So all three are in play.
10           Let's go to June 23rd for a minute.  It says:  Filed
11   by the applicant Entre Rios and Multiflora against former Entre
12   Rios administrators.
13           Are they named, or no?  Is that just a generic?
14           MR. RIBEIRO:  No, they are named, your Honor.
15           THE COURT:  OK.  So you don't have them, but they are
16   named.
17           OK.  Then the same thing is filed by applicant
18   Esperanza.  OK.  Christian.  I know who that is.
19           His company.  That just describes QB Inversiones and
20   J5, S.A., right?
21           MR. RIBEIRO:  Correct.  Then there are four for
22   Esperanza Jacobi administrators who are named in the actual
23   pleading.
24           THE COURT:  OK.  The same would be true for C, right,
25   that you've got the names.  And then I don't know who the names
```

1   of these administrators are, but I suspect you are going to

2   tell me that these administrators have what, nothing to do with

3   these accounts that you seek the application for?

4          MR. RIBEIRO:  Correct.

5          THE COURT:  So I guess I am not really hearing you on

6   why the one in the same is not at issue.  So if you have an

7   affidavit now from Christian saying all these documents that

8   you seek I have control over and I can produce and I'm willing

9   to produce them in Guatemala if and when you have an action in

10  Guatemala that you would need them for, right, why is that not

11  sufficient?

12         MR. RIBEIRO:  Because, your Honor, that is not what he

13  is saying.  He is not committing to producing them.

14         First of all, in our expert declaration, there is no

15  such mechanism to compel Mr. Christian Rasch to produce these

16  documents.

17         Second of all, he is not committing to doing that.  He

18  is qualifying it five different ways.

19         Your Honor, we are not required to take an adversary's

20  position, as your Honor is very well versed in discovery

21  protocols here in the United States, which, by the way, govern

22  a Section 1782 application.  A party is not required to rely on

23  their adversary's search for documents.

24         Respectfully, as your Honor has already noted, it is a

25  highly contentious case and there is simply no reliability into

1    having Mr. Christian Rasch represent that he has access to all

2    these records and he is going to produce them.  We shouldn't

3    have to rely on that, your Honor.

4            THE COURT:  All right.  But one of the issues that I

5    do think you have to address is that the 1782 application can't

6    be really to circumvent otherwise a process that you could

7    complete in Guatemala.  So if all three proceedings take their

8    natural course in Guatemala, are you saying that the Guatemalan

9    court would not be able to ask Mr. Christian for all of those

10   documents?

11           MR. RIBEIRO:  Your Honor, again, as set forth in our

12   declaration and the Ruiz declaration, which he is a Guatemalan

13   lawyer, that is correct.  I did not see --

14           THE COURT:  Show me where he says that, because I

15   don't think he says it as clearly as I thought he might.  So

16   let's go to that.

17           MR. RIBEIRO:  Again, while I find it, your Honor, the

18   fact that several courts have granted 1782 applications with

19   respect to Guatemala would, I think -- is instructive in the

20   sense that they have found that it is not an attempt to

21   circumvent or sidestep any available --

22           THE COURT:  That is a different issue.  That is

23   whether or not a Guatemalan court would be receptive to the

24   information.  There are other courts that have found, right,

25   that Guatemala is receptive.  In fact, I want to say maybe even

```
 1    I have ruled the same in one of these cases before.

 2            That is different.  That is whether or not the court

 3    in Guatemala would accept them.  This is whether or not the

 4    Guatemalan court could, and I think this is the point that

 5    Christian is trying to make, and he may be wrong -- that is

 6    what I'm trying to get to now -- is if the proceeding in

 7    Guatemala takes its normal course, are these documents going to

 8    be subject to compulsion in Guatemala?  Because if they are,

 9    then that does undermine the application because the

10    application is a mess there.

11            So if you could just take me to his affidavit so I

12    could see exactly --

13            MR. RIBEIRO:  Let me pull it up, your Honor.  Give me

14    one minute.  I cite to paragraph 16 of his declaration.  Let me

15    pull it up entirely here.  One second.

16            Your Honor, again, I would also submit they have not

17    provided any expert opinion that such a procedure does exist,

18    but let me find the declaration.  One second.

19            (Pause)

20            THE COURT:  Right.  So what it says is -- I have it

21    here -- it says, entry 17.2, and it says:  Second, there are no

22    discovery procedures in Guatemala that would allow the public

23    prosecutor in the Guatemalan proceedings to obtain discovery

24    directly from foreign individuals or entities without the

25    assistance of a foreign tribunal.
```

1          So that is a different point.  That is, the public

2    prosecutor in Guatemala can't subpoena Bank of America clearly,

3    right.  They can't subpoena a U.S. corporation.

4          MR. RIBEIRO:  Correct.

5          THE COURT:  I mean, they could go through like an MLAT

6    or something like that, but that is an entirely different

7    issue.

8          I think the point I'm trying to get at, and I didn't

9    see your affidavit covering this, is could the public

10   prosecutor -- and I don't know the answer to this at all -- but

11   could the public prosecutor compel Christian to produce it or

12   not.  I don't know.  But I don't see it in your affidavit

13   either.

14         MR. RIBEIRO:  We don't cover that, your Honor.  Again,

15   I don't think that they cover that point either, but I will

16   wait for Mr. Marcus to argue that.

17         Your Honor, I don't have an answer for that right now

18   in terms of that Guatemalan procedure.  But as late as

19   yesterday -- I can confirm this point -- that this concept of

20   compelling a party to produce such documentation is not

21   available in Guatemala as it is here.

22         THE COURT:  I'm sorry.  That is not what paragraph 16

23   says.  So you're saying you have confirmed that otherwise with

24   your expert?

25         MR. RIBEIRO:  Your Honor, again, I would like to

1    submit something to that point.  I mean, again, we don't

2    think -- again, going back to the case law on 1782

3    applications, we don't think that that is a required step that

4    we need -- that that is entirely dispositive of the inquiry.

5    We're not required to exhaust all locally available procedures,

6    and I think the case law is clear on that.

7         If your Honor allows a supplement to discuss the

8    underlying facts of the Guatemalan proceedings, we'd be happy

9    to address this point, because I don't believe --

10        THE COURT:  Yes.  I'm not saying it is dispositive,

11   but if I'm looking at an application with a proceeding in

12   Guatemala that is in fairly early stages, and that is something

13   that is not really addressed, I think, as we sit here.  If

14   you've got these documents, let's say, tomorrow, what could you

15   do with them, right?  Is that a document, are these documents

16   that the Guatemalan prosecutor would accept at this stage?  Is

17   there a mechanism by which you could make them available to the

18   Guatemalan prosecutor?  There might be.

19        MR. RIBEIRO:  That latter point I think we cover in

20   the affidavit, your Honor, that there is no prohibition for a

21   party to gather evidence from any source available.

22        To the granular question of if and when the prosecutor

23   would accept this now, again, we submit that that is beyond the

24   scope of an analysis of 1782, but we would be happy to

25   supplement the record on that.

1          THE COURT:  Yes.  So it is not beyond the analysis

2    because if you are collecting documents, for example, it goes

3    to the receptivity issue.

4          In Guatemala -- and this is just my understanding from

5    my own practice and from having done these before.  The

6    question is not whether or not the applicant is prohibited from

7    getting these kinds of documents from a Guatemalan legal

8    perspective, and the inquiry isn't whether or not Guatemala

9    would accept these in its proceeding, right.  I mean, I think

10   you would say generally Guatemalan courts are receptive.  All

11   right.  That is a very general statement.

12         Here, there are three specific proceedings that have

13   been filed, right?  They are at procedural posture X, right.  I

14   don't know what that procedural posture means for the life of

15   the proceeding in Guatemala.  So what I'm unsure of is, if I

16   grant the application and you get these documents, are these

17   documents that you could use at this stage in Guatemala, right.

18   Because I have had some applications where people say, well, I

19   need them before I apply, right.

20         You have already applied without them.  So I don't

21   know the Guatemalan proceeding, the Guatemalan law well enough

22   to know if you got them now, right, could you supplement, could

23   you do anything with them, would the prosecutor accept them or

24   would the prosecutor have to wait until his or her review is

25   done.  I don't know the answer to that question.  But I do

1    think it bears on some of the Intel factors.  Again, they are

2    not dispositive, but I think that these are issues that I can

3    and should consider.

4            MR. RIBEIRO:  Your Honor, with regard to the

5    receptivity, I think the case law speaks of respondents would

6    have to affirmatively demonstrate that they wouldn't be

7    receptive.

8            Here, there is nothing in the record, including

9    Mr. Christian Rasch's personal lawyer in Guatemala, the best he

10   could muster was he's skeptical that the Guatemalan courts

11   would be receptive.  There is no evidence at all on the record

12   that they're affirmatively saying that they wouldn't accept it.

13           THE COURT:  I agree.  That is not what the record

14   says.  I agree.

15           I'm asking a different question, right.  I'm asking if

16   you've provided anything that -- because I think you do have

17   some obligation to say we need these documents for our

18   proceeding, right, or contemplated proceeding or a current

19   proceeding.

20           MR. RIBEIRO:  Your Honor, respectfully, I don't think

21   we would have to say that we have to have them.  I don't think

22   the case law speaks of an absolute need to have them in the

23   sense of we're required --

24           THE COURT:  OK.  It's better if you let me finish

25   because with the telephone if you start talking, then I can't

1    interrupt you.

2           So I am not asking about an absolute need for them,

3    right.  My question to you, and I don't believe it is anywhere

4    in your pleadings, but I could have missed it, which is why I'm

5    asking you, is if you get these documents, the purpose of these

6    documents is what, right.

7           So I don't know exactly what is going on in the

8    Guatemalan proceedings.  I don't even have, I think, a coherent

9    description of what those proceedings might be and how these

10   documents connect to those proceedings.

11          I know that this family obviously isn't getting along.

12   I know that you'd be incredibly interested to see all of the

13   financial records for Christian and his family.  I could easily

14   understand why that would be interesting and why that would be

15   something you would want, but I have to make some link because

16   I am going to have to find if I grant the application that what

17   you are requesting, right, has a link to either a current

18   proceeding or a contemplated proceeding.  That is why I'm

19   trying to get as much information from you as I can as to what

20   the proceeding in fact is.

21          MR. RIBEIRO:  Understood, your Honor, and apologies

22   for interrupting you.

23          As I requested earlier, I would be happy to

24   supplement, if the court allows me to, to either file an

25   amended application to discuss the underlying facts in more

1    specificity or supplement the record in any other way.

2            Should I continue with the other factors, your Honor,

3    or do you have any other questions?

4            THE COURT:  No, no.  Go ahead.

5            MR. RIBEIRO:  I think we've covered, your Honor, the

6    receptivity of the Guatemalan tribunals.  There no evidence on

7    the record that says that they are not receptive, and, as we

8    cited to the court in our materials, 1782 applications have

9    been granted with respect to Guatemalan proceedings in courts

10   saying, at least in the case of <u>Super Vitaminas</u>, there is no

11   evidence suggesting the Guatemalan courts would be unreceptive

12   to 1782 discovery.

13           With regard to the third Intel factor, your Honor,

14   really the crux of that analysis is whether this is being done

15   in bad faith.  We don't think it is.  I think the California

16   materials that I submitted to the court this morning, and again

17   with apologies, shows that this is not what respondents have

18   classified as a fishing expedition.

19           Caban voluntarily produced documents that show that

20   Multiflora's funds were transferred to Caban ostensibly for

21   shares in that company and then subsequently, after the filing

22   of the Guatemalan proceedings, those Multiflora shares are then

23   canceled and are transferred to a Panamanian company controlled

24   by Mr. Christian Rasch's daughters.

25           So again, with all respect to the respondents, this is

1   not something that is without merit.  There are clearly signs

2   here are malfeasance, and we think and we know that the Morgan

3   Stanley funds from where these transfers came from, as well as

4   Mr. Christian Rasch's Bank of America accounts, would shed

5   further light into that.  So there is no evidence here of bad

6   faith.

7          Then undue burden intrusion, your Honor.  Mr. Rasch in

8   his declaration basically outlines the formation of these

9   entities, right.  He says that Multiflora was established in

10  1994, and that is when he became Multiflora's president.

11         He also testifies with regard to when he purchased the

12  applicant Esperanza Jacobi, and finally, also, that he and his

13  siblings created Entre Rios in 1994.  So if the temporal

14  breadth of the document request is broad, it is because

15  Mr. Christian Rasch has been managing these companies for a

16  very long time and the malfeasance has been discovered recently

17  by his brothers, and that is what the subject of the Guatemalan

18  proceedings are.

19         So we understand that *a priori* it may seem this is

20  very far reaching, but Mr. Christian Rasch's management of

21  those companies has been going on for a very long time.

22         I believe I have covered, your Honor -- if I have not

23  covered your points -- let me look over my notes.

24         I think I have covered them, but I am happy to address

25  any other questions the court has.

1    THE COURT:  Yes.  I'm still very concerned with the

2  breadth of the subpoena.  So you have included his lawyer.

3  This includes accounts for all of his family members, not just

4  the ones that are out in California.  So I'm concerned at the

5  breadth of it, and it doesn't seem like you are proposing that

6  there is any modification that you think is warranted.

7    MR. RIBEIRO:  We think, your Honor, as we noted in, I

8  believe, our reply, we contacted the lawyer, Mr. Furman,

9  subsequent to the application.  He has represented that he

10  doesn't have any documents, your Honor.

11    We're willing, and I think it is appropriate in that

12  case, to take him at his word.  He says he has incorporated

13  those entities and has never had contact with Mr. Christian

14  Rasch in years.  We're prepared to take him at his word on

15  that, your Honor, and not issue a subpoena to the attorney and

16  forego all those issues.

17    When we supplement the record, your Honor, we can --

18  perhaps a second amended application is appropriate here and we

19  will take the court's instructions and modify the requests.

20    THE COURT:  Right.  This is why not having more

21  information on the Guatemalan proceeding is difficult, right,

22  because I don't know the breadth of the proceeding.

23    MR. RIBEIRO:  Yes, your Honor.

24    THE COURT:  It could be the subpoenas as written are

25  relevant or could be used in the contemplated proceeding, but

1   it seems to me that the breadth of them is significant,

2   especially considering that it includes family members.

3          You could have evidence or allege that there is a

4   current fraud afoot.  I don't know that that gives you the

5   ability to go all the way back to the beginning.  Again, I

6   don't know in the Guatemalan proceeding, maybe you can do that,

7   right.  Maybe there is no statute of limitation as to it and so

8   all those documents would be relevant.  Obviously I don't know

9   the answer to that question.

10         MR. RIBEIRO:  Your Honor.

11         THE COURT:  Yes.  Go ahead.

12         MR. RIBEIRO:  I apologize.

13         In light of the comments by the court and to save

14   judicial resources, frankly, in light of the BVI proceedings

15   that are not, as your Honor mentioned, currently before, the

16   applicants respectfully request then an opportunity to file a

17   second amended application that will address the underlying

18   Guatemalan proceedings with more regularity, including the BVI

19   proceedings, and then take the court's comments and tailor the

20   subpoenas as needed.

21         THE COURT:  All right.  I hear you.  Let me hear from

22   Mr. Marcus.

23         Mr. Marcus, I want you to begin with that standing

24   issue.  There is absolutely, obviously, no way that I am going

25   to be making a determination as to who has standing, right.  I

1    think we all agree that is clearly outside of my purview.

2            So my question to you is, are you still challenging

3    that as a standing issue or is the applicants' reading of your

4    reply correct, that essentially you are bringing it to the

5    court's attention but you're not expecting the court to make a

6    determination on that and so that is really not the issue you

7    are proceeding on.

8            Definitely, please, respond to that.  Respond to the

9    issue that you do have a burden, I think, from the respondent's

10   point of view.  If you are going to make the argument that

11   these documents wouldn't be receptive or that it is an end run

12   to the Guatemalan proceeding, what if anything do you have with

13   respect to that, and what do you have with respect to whether

14   or not your client in fact could be asked to produce

15   documentation that is not in Guatemala.  If you can point me to

16   something in the record with respect to that.

17           Then I do want you to address whether or not a more

18   limited document request -- I know you suggest that as an

19   alternative argument, but I want to hear from you as to what

20   limitation you would suggest for the court if the application

21   as is were to be granted.

22       MR. MARCUS:  Very well, your Honor.  I appreciate

23   that.  I think your questions throughout are very much on

24   point.  I will start with the standing.

25           You are right.  You did pick up, obviously, on the

1    concerns we raised.  I just think at a high level -- you are

2    here in the United States.  You are deciding is this an

3    appropriate action, right.  Should this be before you when you

4    have foreign litigation, and what is appropriate.

5        The standing issue, right, is raised because

6    essentially, as you have already noted at a high level, this is

7    a family dispute.  You have a family with a family business.

8    You have a number of companies that our client, Christian, who

9    is the older brother, ran for many, many years after the death

10   of their father, and now you have his two younger brothers, who

11   have joined together to effectively out him from Multiflora and

12   these entities, and these are holding companies in many ways.

13   These aren't businesses with employees, your Honor.  These are

14   investment vehicles.

15       The truth of the matter -- and look, this is part of

16   the foreign litigation, right, both in the BVI and in

17   Guatemala.  The truth of the matter is that there were personal

18   accounts for each of these siblings and there are other

19   accounts, family accounts.  So a lot of what has happened here

20   is like when they accuse our client of making improper

21   transfers -- or we'll talk about Caban, his daughter's company

22   in California.  He made an investment from his personal account

23   and now they are trying to somehow act as if it is wrong.

24       The biggest point of all this, your Honor, and I think

25   when you think about it from standing is, this foreign

1    litigation is going to decide who is rightful in terms of

2    running these companies.  I mean, these are essentially, right,

3    corporate governance issues.  It is a family dispute.  There

4    are corporate agreements.  They are going to be resolved under

5    foreign law in the BVI and in Guatemala to some extent as well.

6         As a threshold matter, I think it raises a question as

7    to why this court should wade into it when you yourself said

8    you don't really have the ability to decide standing.  You see

9    the record.  It is obviously under dispute.  I think it would

10   be perfectly reasonable for the court to stay this and let the

11   foreign proceedings go forward and decide these issues.

12        So that is I think what we were getting at.  I think

13   that --

14        THE COURT:  That doesn't quite answer my question,

15   though, which is, I understand there is obviously a foreign

16   dispute.  There is litigation in Guatemala in the BVI.  But

17   that is not really what is before me.  In the 1782 application,

18   I am not doing that.  I am just trying to determine whether the

19   documents that are requested, right, could be relevant, and

20   obviously that is a very generic or sort of very broad way of

21   describing what the application is.

22        What I am trying to understand is, are you challenging

23   the application because in fact you are saying there is no

24   standing for it or are you merely suggesting to the court,

25   look, there is a lot going on here, use the Intel discretionary

1    factors not to weigh in.

2          Is there really a standing issue that I have before me

3    or not?  If somebody came before me on behalf of a party and

4    their assignment came back and said they have no authority to

5    do this because they have got no connection to the party, then

6    I think I do have some obligation to look at that.

7          The plaintiffs have made or the applicant has made an

8    argument that they are the correct -- that the representative

9    person is accurate.  You seem to concede that it is.  What I am

10   trying to figure out is, it is one thing to say, yes, he is the

11   dual representative now; we think we are going to be able to

12   take him out later; we think that when they did this it was

13   wrong.  But are you contesting that he is duly authorized to

14   bring the application or to authorize the application or not?

15         MR. MARCUS:  Well, we are in the sense that our

16   position would be that, right, whether he is the true and

17   rightful or legal representative, right, it is true that he was

18   appointed.  They filed a document.  There are other things in

19   the record we have pointed to, but that was something that the

20   two brothers did.  But if he wasn't rightfully appointed, then

21   he is not the true legal representative, right.  So that is

22   part of what is at dispute, right, is who actually speaks for

23   this company.  It is sort of wrapped into the family fight.  So

24   that is why I think it becomes relevant to that.

25         I understand it is a messy record from afar.  I think

1    it just goes, again -- look, it goes into, again, I guess sort

2    of the Intel discretionary factors at some level, but it is

3    also I don't believe clear that this is a duly authorized and a

4    true legal representative.

5        It is one thing to file a document abroad.  The other

6    question is whether it is valid.  I think there is contested --

7    the point we raised was this is something that is going to be

8    contested.

9        What happened here, essentially, your Honor, is that,

10    with Guatemala -- it is important to note, these are private

11    criminal complaints that these two brothers brought against our

12    client, right.  They filed them, and that is how -- they filed

13    them.  Then judicial law enforcement bodies are going to review

14    those complaints and decide their appropriateness and how to

15    proceed.

16        So this 1782 application jumps the gun by essentially

17    coming here to seek things, and we will get to that, that can

18    be done through the Guatemalan proceeding.  But it is also done

19    before the judicial law enforcement entities in Guatemala have

20    even looked at any sort of initial level and made any sort of

21    assessment as to whether these proceedings should go forward

22    and are valid under Guatemala law.

23        It is obviously tactical and we think it certainly

24    gets into abusive and bad faith territory for the reasons we

25    have outlined before, but I think it goes to the -- it is

1   important to understand where this is, and what is happening

2   here is really trying to use this court to do very far-reaching

3   fishing expedition type of discovery against one brother

4   instead of going through and litigating the case in Guatemala.

5         To that point, I mean, to address the question you

6   raised about the sufficiency of that proceeding, we did address

7   this, and I think you were correct.  You looked at Mr. Ruiz,

8   their expert, and if you read his submission carefully, he

9   makes the point, as you said, and we are going to make it as

10   well, that all that their expert says is that a public

11   prosecutor doesn't have authority in Guatemala to go to, as you

12   said, like a Bank of America in the United States, a foreign

13   entity, and ask for discovery.

14         Mr. Rasch, our client, Christian, is a party in that

15   case.  We filed, Mr. Linares, our expert, filed an original

16   declaration, but he also filed a supplemental declaration,

17   which is docket entry 18-1.  If you look at paragraph 8, he

18   directly addressed this issue.  This was filed on January 15th

19   of this year.

20         He made clear, he said:  Separately, Mr. Ruiz attests

21   that most of all the discovery sought would not be available in

22   the Guatemala proceedings absent judicial assistance, and he is

23   very clear.  He says this is not true because it assumes

24   Christian does not possess the requested discovery himself.

25         If Christian possesses it, which he attested he does,

1   and common sense supports, then because Christian is a

2   participant in the Guatemalan proceedings there are discovery

3   mechanisms the prosecutor and/or the Guatemalan courts, if the

4   proceedings progress, can use to obtain discovery from

5   Christian if they believe it will assist the case.  So they

6   very much can get this through the Guatemalan proceeding.

7          What they're trying to do is jump that and get it, and

8   obviously for obvious reasons, right, of course they are

9   interested in looking at all of our client's financial records

10  and his family members' records for obvious reasons, but that

11  is not proper.

12         The point is that this is really something that should

13  be decided in Guatemala, in their system, in terms of what is

14  appropriate in discovery, and our client -- technically they're

15  right.  What they've done is, as you've noted, they have picked

16  parties in this application that are sort of alter egos of our

17  client, companies that are holding companies of our client,

18  that our client is the principal of, to get bank records of his

19  and other records of his that they could get in Guatemala.

20         I don't think they have shown any sort of utility or

21  even any structural problem even that would limit their ability

22  to get this discovery.

23         I think what they're concerned about, and this goes to

24  the next issue about the fact that the allegations that they

25  raised in those complaints in Guatemala are just very

1   generalized.  There is no specificity to them.  There is no

2   details of allegations.  It is just general fraud, moral

3   turpitude.

4          I think their concern is that if it is just trumped-up

5   allegations without any basis in Guatemala, that when law

6   enforcement looks at it and when the Justice Ministry looks at

7   it, they may decide that there is nothing to pursue and the

8   proceedings there may not go anywhere.  I think that is why

9   they are trying to come here and get what they can and get as

10  much as they can.

11         Look, this --

12         THE COURT:  Let me stop you for a second.  They don't

13  have to show that they -- the fact that they can get them in

14  Guatemala I don't think is dispositive.  It is certainly

15  something I should consider in the Intel factors, but I think

16  Mr. Ribeiro is right on that.  That sounds dispositive, right.

17  The fact that they could eventually get that in Guatemala

18  doesn't mean that they are precluded from trying to get it

19  here.

20         MR. MARCUS:  Well, so again, when you look at the

21  Intel factors, right, you look at are they attempting to

22  circumvent, right, the foreign proceeding and the ability to

23  gather evidence there.  We talked about this.  What courts look

24  at is, right, is this abusive, are these abusive tactics, are

25  they in good faith, what is going on, what is the purpose for

1    why they are doing it.

2          I think while it is not dispositive on its own, it

3    fits into, I think, a storyline which is troubling because it

4    is trying to game a system, right.  It is not using -- filing

5    something that may have no merit in Guatemala, not allowing

6    that proceeding to even proceed even in an initial way to make

7    any determinations, and then running here and filing extremely

8    broad-based discovery, right, to supposedly help the Guatemala

9    case, that is very invasive and could be used, frankly, for

10   other litigation, whether it is going to be in the United

11   States later against our client or as part of the BVI or some

12   other forum.  So I do think the discretionary factors weigh

13   there.

14         Just to answer your Honor's question -- I know you had

15   asked it initially -- we are not disputing the statutory

16   factors and whether they've been technically met.  I think the

17   discretionary factors in this case are very strong in our

18   favor, particularly when you weigh what is being asked and the

19   status of the proceedings.

20         These are extremely broad requests.  Are they unduly

21   intrusive?  Are they burdensome?  I think they are.  The one

22   example they give you with any specificity is they talk about

23   Christian's daughters, his daughter Alexandra and her company

24   Caban.  I mean, again, this is something that would play out in

25   litigation.

1              So she is a Stanford grad who started like an

2     alternative energy company that is doing very well in solar and

3     other things.  That investment that they are talking about,

4     again, came from Christian's private personal fund in

5     Multiflora, not something that his brothers had any interest

6     in.  They are trying to use that and try to blend these

7     accounts, even though they know that all of them, not just my

8     client, but each of them as well had individual accounts and

9     that is where that money came from and that is what would be

10    shown.

11             The discovery that they have put before you, your

12    Honor, isn't specific.  It is not transaction specific, it is

13    not transfer specific, right.  It is broad time lines.  It is

14    asking for -- you're talking about over 100 requests.  I think

15    they go back almost 30 years.  This isn't even -- by the way,

16    they filed in California on Caban as well.  They have a 1782

17    there.

18             There is no regard for proportionality with these

19    requests.  There is nothing -- the problem is you don't have

20    anything before you from Guatemala that is specific.  This

21    isn't a situation where there are three transactions at issue

22    in Guatemala and the discovery they are asking for here mirrors

23    those three transactions, right.  You don't have that at all.

24    You have simply as broad a fishing discovery expedition as you

25    would see.  That is unduly intrusive.  That is burdensome.  We

1    believe it is in bad faith.  I don't see any exercise of good

2    faith there.

3           So I think when you weigh the discretionary factors --

4           THE COURT:  I think that is a bit too far, right.  I

5    am not going to go as far as to say it is bad faith, right.  I

6    mean, in my mind if you are talking about bad faith, you would

7    say, OK, look, there is absolutely no allegation here or we

8    know, for example, that they can't even bring this in Guatemala

9    and you have an affidavit that says so.  This isn't bad faith.

10   It might be premature, it might be too broad, but I am not

11   going to go that far.

12          I think there are some issues with the application.

13   In my mind the issue is whether or not those things can be

14   cured.  So I am very interested on the issues of what is the

15   cause of action in Guatemala, how broad is it, where is it at,

16   because if, for example, the Guatemalan prosecutor has 90 days

17   to decide whether they go forward or not, then -- and the

18   Guatemalan prosecutor, for example, whatever has been said or

19   whatever has been filed has already closed and the Guatemalan

20   prosecutor just has to decide, then should I wait to see

21   whether or not the proceedings go forward.  If it does go

22   forward, typically, right, in those situations the prosecutor

23   would say this is what we're going forward on and then I've got

24   something entirely different.

25          The fact that the Guatemalan prosecutor or that the

1    applicant in Guatemala may be able to get this through

2    Christian anyway is important but it is not dispositive.  But

3    if I waited or at least I had more information as to what

4    really was going on in Guatemala, I think the request could be

5    more tailored.

6         Right now, as I sit here, the request seemed to me

7    very broad and overreaching.  I don't think that is bad faith.

8    I think they have cast a net wide, hope they get as much as

9    they can, but you are not going to start betting against

10   yourself.  That I see.  But again, I just stopped you on the

11   bad faith because my ears do perk up when people make those

12   kind of arguments, and I don't think you've got that.

13        MR. MARCUS:  It is a point well-taken.  I think the

14   issue is more, obviously, this is a very personal and heated

15   dispute amongst family members.  I think pushing for such

16   broad-based discovery at this stage, when it is so early in the

17   Guatemala proceedings and it is unclear where they will go and

18   there is no prejudice that's been shown as to their ability to

19   gather appropriate discovery in that proceeding, coupled with

20   the fact that you don't have specific details even alleged in

21   Guatemala that are then linked to the discovery request here,

22   where there is proportionality and it is narrowly tailored, I

23   think those are all good reasons for this court to wait, at the

24   very least, and see what progresses there and if there are more

25   details as opposed to simply allowing the applicant to have

1    that kind of broad-based discovery, you know, financial

2    discovery of personal records, as you see the requests on this

3    record.  So it is a point well-taken.  But I do think --

4            THE COURT:  What is your client's expectation as to

5    when the Guatemalan prosecutor will make a decision as to the

6    claims that have been brought forth by the applicant?

7            MR. MARCUS:  So there was an initial -- that part is

8    unclear.  I mean, the other side -- so the applicant, the two

9    brothers on that side, our understanding is that they moved to

10   recuse one of the prosecutors.  So there is a new prosecutor

11   that has been assigned that is now looking at -- because one of

12   these proceedings was dismissed, the August 4th proceeding.  So

13   it is being looked at.

14           I don't think we have an exact timetable as to when

15   that decision, that sort of initial decision would be made, but

16   I believe -- our understanding is it is ongoing now.  It is

17   being looked at.

18           THE COURT:  Let me hear from you for a second, Mr.

19   Ribeiro, on this issue of sort of the trajectory of the

20   Guatemalan proceeding.

21           Let me ask you specifically, why wouldn't we wait to

22   see what the scope of the Guatemalan proceeding is going to be?

23           MR. RIBEIRO:  Well, your Honor, as a threshold matter,

24   respondent's counsel I think is speculating as to where the

25   level is or where in that process they are.  He mentioned

1    several times it's very early on, etc.  The record doesn't

2    reflect where -- I don't think anybody here can definitively

3    say where that process is.  We don't think we should wait

4    because Section 1782 doesn't require us to wait.

5          Now, I take the court's comments to heart.  Again, we

6    request an opportunity to provide more detail to satisfy the

7    court's questions with regard to the facts of the underlying

8    proceeding, but I am not sure we could be able to find where

9    this is in the prosecutor's time line because, frankly, I am

10   not sure that is the kind of information we would be privy to.

11         To the extent it is possible and if your Honor allows

12   an opportunity to amend, we can address that issue.  But

13   sitting here today neither me nor Mr. Marcus has any idea what

14   or where this is with regard to the Guatemalan prosecutors.

15         If I could just address --

16         THE COURT:  Right.  Look, nobody knows what

17   prosecutors do.  I think that is universal, whether you are in

18   Guatemala or anyplace else, right.  I mean, sometimes somebody

19   who has an expertise in a particular country, including this

20   one, can tell you kind of what the average length of time might

21   be.

22         Again, that goes back to my issue which I do think,

23   even though we are not arguing about the statutory factors, it

24   seems like it does concern me, because if, for example, you get

25   these documents -- that was my question to you at the

1   beginning, right.  If you have them tomorrow, if the Guatemalan

2   proceeding right now is at a point where you have got to let it

3   run and there is nothing you can do about it until the

4   Guatemalan prosecutor responds, then your need for the

5   documents seems to evaporate.

6         If you have the documents and you continue to provide

7   them to the Guatemalan prosecutor, then that is one thing.  If

8   there is nothing that can be done with the documents until the

9   scope is set, right, or if you don't have a better idea of what

10   the scope is until the Guatemalan prosecutor is done, then that

11   to me is helpful too.

12        My concern is, again, back to where we are in

13   Guatemala, right, because anybody could say so-and-so defrauded

14   me and I complained to the Guatemalan prosecutor.  People may

15   complain to the police, the FBI here all the time.  It is so

16   different in any other place of the world.  Just stating that

17   to a law enforcement agency would be enough to come to the

18   United States and get a person's, all of a person's bank

19   records, financial records and their family, I promise you that

20   is not how I see, at any rate, the statute.

21        So again, some of these arguments I agree with you.

22   Your burden is not what has to be shown.  The standing argument

23   I think is falling apart pretty quickly.  I understand there is

24   a lot going back and forth.  I don't think there is enough here

25   for me to say that there is sufficient in this record to

1   proceed.  So I don't think I need anything more on the standing

2   issue.

3           Clearly there has been a lot of litigation about it,

4   it appears, as to whether or not they could or couldn't do

5   this, but I am not really hearing anything that there is an

6   attack as to whether or not as we sit here today or as when

7   this application was filed the person who was acting as the

8   legal representative had authority to do so.

9           So I don't really need to hear more about the

10  standing, but I would be interested, and let me hear just from

11  you, Mr. Marcus, on what your objection would be.  I do think

12  an amendment is in order because the application that I have

13  right now doesn't give me sufficient information about the

14  Guatemalan proceeding, and that gives me two issues.

15          One, it does make me wonder whether or not there is

16  sufficient to grant the application at all.  Number two, even

17  if I am inclined to grant the application, I don't have any way

18  to limit the responses or limit the request, which I think I

19  should because on their face they are way too broad.  Even if I

20  take the lawyer out of it, you have got family members, the

21  time frame is very broad.  So I am concerned about that, but I

22  can't do anything with it, of course, because I don't know what

23  the Guatemalan proceedings, how they're tailored.

24          So what say you about allowing an amendment?

25          MR. RIBEIRO:  I mean, your Honor, I do think that the

1    application as it stands is deficient.  I mean, in terms of an

2    amendment, I think it will depend, obviously, on what they are

3    able to produce out of Guatemala.  Because remember, all of

4    this is about trying to provide discovery to aid in the

5    Guatemala proceeding.  We don't have allegations with any

6    specifics.  We don't have anything from the law enforcement or

7    judicial entities there requesting certain documents, right.  I

8    mean, this isn't a situation that might --

9         THE COURT:  He doesn't need that.  He doesn't need

10   that.  I mean, clearly if the Guatemalan authorities were doing

11   that it would be a completely different conversation.  But if

12   he can come forward -- my thinking on allowing him to amend is,

13   if I didn't think he could ever get this stuff, then I'd deny

14   it and he could take it up then with Judge Martinez.  I could

15   just deny the application without prejudice.  But it seems to

16   me that this information is out there.  It is not here, but

17   he's got it somewhere.  I mean, somebody filed this in

18   Guatemala.

19        His expert in Guatemala can tell him where the

20   proceeding is from a procedural perspective, what the documents

21   could be useful for given the application.  I'd like to hear,

22   again, more specificity on what that application is and how

23   these documents relate to the application at hand, because at

24   least from a statutory perspective -- I know we kind of glossed

25   over that today because there are proceedings.  We glossed over

1   it because we know there are proceedings, right.  But I think I

2   need to know more about those proceedings to match up the

3   document request.  Because if I've got more, then I have to

4   tell you, I mean, I think the needle is way more on their end

5   than it is on yours, because I would give them something.  I

6   just can't give them the subpoenas that they've got now, right.

7         They have got allegations.  They filed something in

8   Guatemala.  It is something that is being looked at.  I need

9   more than that, though.  I need to make sure that it is not,

10  well, we filed something in Guatemala and 15 years from now

11  somebody might tell us, right.  Because you can walk into the

12  FBI right now, have a complaint about your neighbor and, trust

13  me, never hear back, and that wouldn't be enough.

14        So I want to make sure that what is going on in

15  Guatemala is real, and it is real from the perspective of, yes,

16  there is somebody really looking at it, we are going to get

17  something back, and we shouldn't wait, right, to see what the

18  prosecutor is going to do in Guatemala because these are

19  important to what is happening now.

20        Those are links that, look, maybe they can't make

21  them.  If they can't make them, then we will find out when he

22  amends the application.  In my mind it seems fair or at least

23  more efficient, I should say, to allow an amendment and see if

24  those questions can be answered as opposed to just denying it

25  without prejudice and then he is going to file the same thing

1    in 30 days.  Because he knows why I denied it here.  So it is

2    one half dozen of the other.

3            I would rather allow the amendment than deny it

4    without prejudice, have to go through the rigmarole of the R&R,

5    the objections to the R&R, and then he's still going to file

6    it.  I would deny it without prejudice.  I wouldn't deny it at

7    this stage with prejudice.

8            Mr. Ribeiro, if I allowed you to amend, how long would

9    you need?

10           MR. RIBEIRO:  Your Honor, in light of the issue of

11   obtaining the expert declaration and translation and back and

12   forth, if the court could give me 20 days.

13           THE COURT:  I would give you more than that.  I am

14   happy to give you 30.

15           MR. RIBEIRO:  OK.  I'll take 30, your Honor.  Thank

16   you.

17           THE COURT:  Mr. Marcus.

18           MR. MARCUS:  I don't have a problem with that, your

19   Honor.  I understand the approach.

20           I just want to note, and this is something I guess we

21   would address the second time around, on the standing, we did

22   contest -- the legal representative, Mr. Xicara, we did contest

23   was wrongfully appointed in the initial application.  We can

24   certainly address that with whatever is presented in the

25   amended application.  But obviously if he is wrongfully

1   appointed, then you are going to have an issue.

2           THE COURT:  Right, but where have you contested that

3   other -- contesting it to me is of no moment because I can't do

4   anything about it.  Is that contested anyplace else?  There a

5   current proceeding in Guatemala, for example, that contests

6   that?  Because there doesn't appear to be one.

7           MR. MARCUS:  I will check on that.  I believe it's

8   been raised, but I do want to, before giving you a definitive

9   answer, I want to check on the posture of that procedurally in

10  Guatemala.

11          THE COURT:  To me, it seems like much to do about

12  nothing right now.  There is a lot going on back and forth.  I

13  have got the applicant saying, look, here's the documentation,

14  and your issue is, well, he should never have been able to do

15  this from the first instance.  I can't decide that anyway and

16  nobody else seems to be deciding it.  So I can't deny the

17  application on that basis.

18          MR. MARCUS:  Yes.  Right.  It has been raised.  I

19  mean, look, I understand.  Obviously our concern is, it is one

20  thing to provide tailored discovery to an appropriate foreign

21  proceeding.  It is another for something to be used sort of in

22  a pretextual way just to gather broad-based discovery against

23  the brother to then use it offensively maybe in future

24  litigation or others, and that is certainly not what the

25  statute is about.  Obviously that is what some of these factors

1    weigh at.

2            THE COURT:  Right.  That precisely is my concern, and

3    if I thought that they couldn't meet that burden as we sit here

4    today, I would just deny it.  I just think that there is more

5    out there.  Maybe I'm wrong.  Maybe they still can't -- maybe

6    they won't get there.  That is what I'm trying to fish out, for

7    lack of a better way of putting it, right, which is, is there a

8    real proceeding going on in Guatemala, is there something that

9    we're pursuing, or did somebody make a claim to the Guatemalan

10   prosecutor that essentially is going to go nowhere but you're

11   using that as a way of getting broad-based discovery for sort

12   of unknown proceedings and unknown reasons, because there is

13   clearly a very volatile family dispute going on.

14           In one instance you get 1782 discovery and in another

15   one you don't.  I don't know exactly where it is at, at least

16   as I sit here on this application.  I want to be sure before I

17   grant it that I am not looking at a situation where two

18   brothers went to Guatemala, made some complaint on the back of

19   an envelope, dropped it off at the prosecutor's office, and now

20   they think -- and I am not even suggesting that they are doing

21   that in bad faith -- and now they think, oh, there is something

22   really big in Guatemala and we can get documents in the U.S.

23   now.  Because, again, these family disputes tend to be,

24   obviously, very heated and very volatile.  I just want to make

25   sure, I think I have to make sure, that what is in Guatemala is

1    a proceeding that I can tie up to any discovery I would allow.

2              There are some days you feel you are not really clear.

3    I hope I'm being clear.  I am not sure that I am.

4              MR. MARCUS:  You are, your Honor.  Thank you.

5              THE COURT:  Mr. Ribeiro, I don't know if I'm being

6    clear, but I hope you understand where I'm getting at with

7    this.

8              MR. RIBEIRO:  Loud and clear, your Honor.  Thank you

9    for allowing the amendment.

10             THE COURT:  Yes.  I am going to allow the amendment.

11   I'll give you 30 days.

12             Mr. Marcus, if you are going to file any kind of

13   response, I'll give you 20 days to do it.  If you need more

14   time, obviously let me know.  There doesn't seem to be a huge

15   rush given sort of where things are, but that could change.

16             So I'll give 30 and 20, and then I typically have oral

17   argument on all these things.  Unless whatever I get is so

18   obvious one way or another, I typically let the parties argue

19   it, especially on an application and especially, quite frankly,

20   if I'm going to even grant it, because sometimes it's easier to

21   noodle what the scope of the discovery should be if we are all

22   on the same line.  It is definitely easier if we are all in the

23   same place, but I don't hold out any hope that 60 days from now

24   we will be in my courtroom.  Hopefully I'm wrong about that.

25   If we can do it in person, God knows, I'll let you do that.

1  Like I said, I don't know that we will be there in 60 days.

2    All right.  So what I will do is I will just put in a

3  paperless order that grants the request to amend the

4  application.  I will take it as an ore tenus request to amend

5  the application and I will grant it without objection.  Then I

6  will probably see you gentlemen in about 60 days.  All right.

7    MR. MARCUS:  Thank you, your Honor.  I appreciate it.

8    MR. RIBEIRO:  Thank you, your Honor.

9    THE COURT:  All right.  Anything further from the

10  applicant?

11    MR. RIBEIRO:  Nothing further, your Honor.  Thank you.

12    THE COURT:  All right.  From the respondent or the

13  intervenor, anything else?

14    MR. MARCUS:  No, your Honor.

15    THE COURT:  All right.  Everybody stay safe and have a

16  good weekend.

17    (Adjourned)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


May 7, 2021                s/ Joanne Mancari
                           Joanne Mancari, RPR, CRR, CSR
                           Court Reporter
                           jemancari@gmail.com